which Mr. Miller who's here today serves as the Chapter 7 trustee. Below on summary judgment the court held that Wachovia had an enforceable security interest in this deposit account under the UCC provision in California and I think that same provision is universal. Everyone agrees California law applies however there's no real conflict. I think there's a false conflict which means you can look to the laws of all jurisdictions. We have interesting questions on that. Obviously we're looking at the California UCC I think you'll find the same provisions elsewhere but when we get to what the lower courts did and the principles upon which they applied now we're dealing with more universal principles of agency, imputation, apparent authority, things of that sort which are certainly not unique to the UCC and these are pretty well established principles. It's restatement and other sources. Without question. Right. Common law, restatement, a lot of law on the on the principle. If Wachovia can show that JLH was aware that it's 10 million dollar deposit was used to securitize Holmes's loan with Wachovia then you lose the case. Well not really your honor it's a question of when you say JLH is aware. If the Board of Directors as a body is aware I think we have to get to the nub of what does that mean for a company to be aware. We have. Well does it have to be the Board of Directors as opposed to a high-ranking official in JLH like the president? Yeah I think that I think that's not sufficient because the president under the bylaws doesn't have the authority to consent or bind the company. In the in the area of corporate law and banks are very familiar with this you obtain resolutions from the Board of Directors to support loans or pledges because it is common knowledge that presidents often do not have that authority so if somebody without the authority has the knowledge I would submit that's not sufficient. Now but when dealing with Wachovia why couldn't Wachovia understand Mr. Stelmar to have that authority when you sign documents pledging the money in JLH's account? Here's why your honor because when Wachovia did that they knew that Mr. Stelmar was acting solely wearing the hat of WL Holmes. They had no knowledge they had no idea that he had any position with JLH. As a matter of fact they claim to have not known that JLH was a separate company. When they when they arranged this loan they thought that the JLH account that's being referenced in the loan agreement it's being referenced as WL Holmes's JLH account. They funded it though right? No question JLH funded it. No question. WL funded the JLH account didn't it? Well the way it works with all captive insurance companies when you first form the captive which is a separate regulated company of course the parent company puts some money into that captive's account and then premiums are paid that build up over a period of years and yes those premiums do come from the parent company and but that is the whole essence and nature of a captive for example to the extent a parent funds accounts of a subsidiary. May I ask you this Mr. Kern? Sure. Wasn't that deposit made in Wachovia's bank at at the request of Wachovia? Well when you say at the request of Wachovia. Wachovia was lending or It's not going to do that willy-nilly. It wants some security and for that security did it not demand that JLH deposit ten million dollars in its bank? We need to back up your honor. Correct my mistaken impression. You are not entirely mistaken but I need to correct something. This was the renewal of an amount of money totally unsecured. There's record evidence that the parties all considered this new loan to have been unsecured although for legal reasons the lower courts disregarded that but so to suggest that somehow Wachovia wasn't lending this kind of money with collateral is contrary to the facts and the prior relationship. For years they lent this money without collateral and Mr. Stelmar who was the CFO and who negotiated the loan testified that he negotiated an unsecured loan. He then stepped out of the picture and other individuals executed a loan agreement that being two officers of W.L. Holmes executed that loan agreement. Mr. Stelmar did not execute that. But then he executed the letter. No question about it. Thereafter he executed two letters which renewed the line of credit of course reaffirmed the obligations under the line of credit. What was the purpose of the ten million dollar JLH account? The JLH account was JLH's statutory insurance reserve capital. In order to maintain a captive insurance company you have to set aside certain capital. You are strictly regulated by the insurance department. In this particular case it was the Arizona Department of Insurance that required, that monitored your capital and required, prohibited you from pledging that capital. I understand from the record there's only one person who could have authorized withdrawals from that account and that person was an officer of Holmes. Is that accurate? No that's not true. The person that really authorized it was individuals who were officers of JLH. However they directed people from W.L. Holmes, they had the authority to direct people. But let's remember not one penny of that money was ever touched. We're talking about who could have touched it, had they chosen to touch it, and none of that ever happened. No money came out of that account. Let me restate that. Were there not officers of W.L. Holmes who controlled the money that was in the JLH account? No question there were there were officers of W.L. Holmes who signed signature cards as the record reflects that the titles and all that were mistaken. But there is no question that some of the names on that account, and as we point out, we recall the critical part of that deposit account wasn't signed. How can you overcome the question that the consent to JLH's consent is properly imputed to them? Well it isn't imputed to them for the following reason. And we, I'm sorry for our poor artwork, but we diagrammed what actually happened below in our reply brief. And what we saw is how the principles of the parent authority and imputation were misapplied to arrive at this result. We start with the basic premise that you are only impute knowledge to a principal for an agent acting on behalf of that principal. If somebody's acting on behalf of W.L. Holmes, you impute knowledge to W.L. Holmes. You do not impute it to some other company for whom they may also be a member of JLH. No. When everyone who signed documents for purposes of the loan acted solely on behalf of W.L. Holmes. No question that he was an officer, no question that in fact he was he was either president or chief financial officer. He was the CFO of W.L. Holmes and the president of JLH. He wears two hats, which is not uncommon in parents and subsidiaries. The law requires you to look to what hat they're wearing and on whose behalf they're acting, because when they wear one hat, they don't bind the other. If your honors hold otherwise, then every subsidiary will be responsible for the liability of the parent. What about California Code, what about California Civil Code 2332? It talks about knowledge between principal and agent flowing both ways. Now you said that California law prevails here. It doesn't flow both ways in the context of the dual agency. As a and you have situations here where what you have is it flowed up, then it flowed down, then it flowed across, and then it flowed up again. You are using principles of imputation and fictions upon fiction to arrive at a result where an entity's property was pledged without anyone acting on that entity's behalf. But you've got perhaps the highest official in JLH who was around for this loan agreement. It mentions both JLH and W.L. Holmes. You're saying there's no duty at all to report. He's reading it. He was involved in negotiations, and it just comes out of nowhere? The agency principles that apply are not based on a duty to report. That standard has never been adopted anywhere. The agency principles that apply are one, you impute knowledge of an agent to the principal on whose behalf he is acting at the time he acquires the knowledge. If he is a dual agent, you do not impute it to the other entity unless he was acting on behalf of that entity at the time. And there is no evidence in this case that anyone acted on behalf of JLH, and everybody testified to the contrary. And when you see how they signed, they signed solely as officers or agents of W.L. Holmes. How do you distinguish the natural gas case out of California in 1976? Aren't those facts somewhat similar? I can't. Yeah, I'm not. You did acknowledge that an officer of W.L. Holmes had control of the funds in the JLH account. In other words, could authorize withdrawals. I do acknowledge that officers of W.L. Holmes could withdraw funds in that account. However, for the benefit of JLH, there's nothing in that document which lets you pledge the account. For example, if you have signing authority on behalf of one corporation, yes, you can go take the money out, but you can't do it to pay your home mortgage, and you can't do it for the wrong purposes. So yes, they do have the control, but they're doing so only when they act on behalf of JLH. That's fine, but why isn't that sufficient for use and control? It's not sufficient for use and control because when you're dealing with a deposit account, I would submit to you that the bank knows whose account it is. They know it's not in the name of the loan debtor. It's in the name of someone else with a different name and a different tax ID number. Under those circumstances, use and control requires the consent or permission of that third party. You don't have use and control with a deposit account otherwise. If you go back to the principles upon which use and control was founded, it was because the possession of equipment or crops and the use of those provide outward manifestations of ownership. That's the key, and you can't have outward manifestations of ownership when the account's in the other person's name. They know that's owned by someone else. I'm going to get over to the other side. I know I'm beyond my time. I apologize. I did want to reserve five minutes, and I forgot to say it up front. Thank you so much. We'll get you back. Mr. Woolley? Good morning. May it please the Court. James Woolley from Milbank, Tweed, Hadley, and on behalf of Wachovia Bank, N.A. I'll address some of the points that counsel raised. I'd like to start with a couple of important overarching points. Firstly, the section of the UCC that we're dealing with is actually specifically crafted in such a way as to prevent the outcome that the appellants are seeking. It's crafted with the term rights and collateral as to the parties pledging the collateral, with that term rights very broadly interpreted to prevent situations in which a borrower goes to a lender, pledges collateral to induce a loan, defaults on the loan, and then says, whoops, it wasn't our collateral to pledge. Why is it, Mr. Koren, correct that Stelmer had no authority to pledge that $10 million deposit because there was no resolution by the Board of Directors, no consultation with JLH. He did it of his own accord. Therefore, no imputation. Right. The appellants, they're conflating actual consent, formal consent, with imputed consent, and the way that they are arguing the doctrine, it would erase the whole notion of imputed consent. If you have to have a resolution of the Board of Directors. Why should consent be imputed? Why should it be imputed? Should it be? He didn't hold himself out as an officer of JLH during these negotiations, I assume, right? Well, it's admitted by the appellants that he was the one who negotiated this deal, and he's the one who actually arranged for this account to be set up. But in that connection, he was doing it on behalf of W. L. Holmes. Is that right? Well, insofar as W. L. Holmes was the party to the loan agreement, but at some point when you have the president of an entity, even though he's acting officially on behalf of another entity, if he's doing these acts, and then they actually make it happen. After the loan agreement was executed, within a couple weeks, that account was set up. It was set up in that amount of 10 million dollars, which he had arranged as part of the negotiations, and which is specified in the loan agreement. Why is that relevant on the imputation issue? Well, it has to do with the title that he had as president of JLH Insurance. And we have a case law that says that when you have an officer like that, even though he signs the loan and agrees to the loan on behalf of another entity, the fact that he has consented to it is imputed to the other principle. The Atchison case out of the 11th Circuit says exactly that. And secondly, even if you don't immediately impute the consent to JLH Insurance by the fact that Mr. Stomar has consented, they're clearly on notice. The notice is that JLH didn't take any action to say that... Can they ratify it by their silence? Exactly, Your Honor. And that's actually another basis. Even if you don't say that the consent wasn't immediately imputed to them, they sat back, they didn't do anything. Did JLH have notice of this whole arrangement? I mean, I guess through Stomar, but otherwise, did the Board of Trustees have They were on notice, certainly by the agency law that we discuss in our papers. They were definitely on notice through Mr. Stomar. And the reality here is that JLH Insurance is not a sort of an innocent bystander or separate from W.L. Holmes. The appellants have cited a grand total of two cases in which a debtor was held not to have sufficient rights and collateral to pledge it. Both of those cases involved misconduct, criminality, a forgery of the collateral owner's consent. What about Mr. Corrin's comment that this is a very special account? It's called a captive account and is established under Arizona law. And the money deposited into this account has a very specific special purpose under state law, that is Arizona law, which is to pay off insurance claims and I understand to pay off maybe deductibles. And that money has to be kept in reserve. So it cannot be under Arizona law used as securitization for a separate home. Right? I understand the argument. Right. Well, the first of all, the only insured under that policy was W.L. Holmes. JLH Insurance had no obligations to anybody else. And the JLH Insurance is a pure captive entity. The purpose of it was established by W.L. Holmes. And the purpose of it is to serve as basically a savings vehicle for the parent to, on a regular basis, put in money that then can be available because W.L. Holmes had a $1 million deductible on its third party insurance. During this period, was there any money taken out or deposited in that account? Out of that account, no. And we believe that that's consistent with the requirement in the loan agreement that that minimum balance stay at $10 million. And so had they taken money out of the account, they would have been violating the loan agreement. In the loan agreement, was there a requirement that a specific sum be deposited as collateral? Yes. The loan agreement specifies that the JLH account has to have a minimum of $10 million in it. That's specified. And the loan agreement also refers to... Deposited in a Wachovia account. Right. It refers to the JLH Insurance co-deposit account or something like that. And then it defines it as the JLH account in a minimum balance of $10 million. And it also... What about the timing? Was there any... How about the proximity of the granting of the loan and the deposit made? Can you talk about that? Sure. The loan was finally executed in late December of 2007, around Christmas time. And the account was set up, and all of this is in the record and undisputed, around mid-January of 2008. And so there was very close proximity. The loan was executed, and then W.L. Holmes went ahead and complied with its obligation to set up that account and fund it in the exact amount of $10 million. But Arizona law also required this kind of an account to be set up, right? No. Arizona law didn't... For a captive insurance company? No. In Arizona law, there are certain regulations that apply to the captive insurer. They're less onerous than regulations that apply to insurers that have numerous policyholders, because the only party that is ultimately at risk is the parent company, which is set up and controls the captive. And again, W.L. Holmes' absolute control over JLH insurance is undisputed here. That's something that the appellants have never disputed, that W.L. Holmes exercised absolute control over that captive, which is the nature of... Yeah, I was going to ask you about that. In what way? In what way... I mean, can W.L. Holmes just go in there and take the $10 million out? Well, we have testimony from the controller of W.L. Holmes that anybody who needed to do that would have to talk to him. The reality is... Who is him? The controller of W.L. Holmes, James Chang. Okay. The reality is that part of the premise of the appellant's case here is that JLH insurance had this independent decision-making ability. It was separately incorporated, yes. W.L. Holmes did that because there are certain tax advantages, accounting advantages to separately incorporating the captive. But it didn't have any independent decision-making ability. It was absolutely controlled by W.L. Holmes. Three of the directors were top W.L. Holmes officers, including Mr. Stelmar. The other two were representatives of Aon Insurance, which was just the administrator, the captive manager that's required by Arizona law. And so this was simply an appendage of W.L. Holmes. It had no independent decision-making ability. And so the notion that JLH insurance didn't consent to this, or even was against it, which was suggested in the appellant's papers, it just doesn't make any sense. How could JLH insurance, which is controlled by W.L. Holmes, absolutely controlled, how could it be against something that W.L. Holmes has consented to? If I'm not mistaken, the district court said that there was no use in control. Is that correct? That's correct, Your Honor, and we respectfully disagree. That's your cross-appeal? And I can certainly address that. The district court did not address our first point, which is that given the undisputed absolute control that W.L. Holmes exercised over JLH insurance, and in fact, JLH insurance described itself in filings with the Arizona Department of Insurance as an asset of W.L. Holmes. So if W.L. Holmes owns JLH insurance and absolutely controls it, then how does it not control an asset that's held in the name of JLH insurance? The bankruptcy court didn't address that point. As to specific control, and in fact, counsel just conceded here on the record that W.L. Holmes did have control over the JLH account. Now, he says use and control isn't enough, that you have to have consent as well. That's just not what the case law provides. Either use and control or consent is sufficient. Can I ask you a question because your time's running short? Your adversary argues something to the effect of that the security agreement would be invalid if these opinions stand because Arizona law prohibits it. What's the effect of Arizona law here? Is this just a red herring? Right. It is, Your Honor, even if there's some... If they're violating Arizona law, isn't just their license, isn't that all that would be lost? Exactly, and the bankruptcy court addressed that issue with reference to the Coronet case out of California, which says that if a loan somehow violates a statute, the borrower doesn't just get off scot-free because of that. And the consequence for JLH insurance would have been revocation of the license and maybe some fines. It wouldn't be fair to penalize Wachovia because they went and didn't comply with their obligations under Arizona insurance law. And I would add that in the loan agreement, W.L. Holmes covenanted that it was going to meet all of the applicable laws and regulations to make that loan agreement fully effective. If you knew you were dealing with a totally different party, a totally different depository, why would not Wachovia, given the amount of money involved, $10 million, why would you ask for a resolution from JLH Board authorizing the deposit of $10 million and authorizing that that money be used as security? Certainly, Wachovia could have done that, and in hindsight, maybe it should have done that. But ultimately, the UCC definition of rights doesn't turn on that. It could have gone and gotten an additional signature from JLH insurance. I think it's an artifact of the relationship that W.L. Holmes and Wachovia had at the time. W.L. Holmes was building a lot of homes. There was an ongoing relationship. There was a much larger loan facility. There were a lot of personal relationships here, and that's sort of why the loan was documented the way that it was. But even absent that signature from JLH insurance or from Mr. Stelmar with a line under his name saying president of JLH insurance, the case law is clear that when you have the borrower and the claimed owner of the collateral basically overlapping, the claimed owner of the collateral isn't out here an innocent third party. They're really enmeshed within the borrower. Under those circumstances, the Acheson case, the Enry coupon clearinghouse case from the Ninth Circuit, the Enry pubs case from the Seventh Circuit, all of those say you have to enforce the collateral interest because ultimately what the decision is here is where the borrower is defaulted, and you have three parties involved, the lender, the borrower, and the owner of the collateral. Somebody has to lose. Either the lender loses out, the security interest is held to be invalid, or the owner of the collateral loses out if the security interest is valid. And so it really comes down to I think the fairness principles that underlie this provision of the UCC. Which way is it fair to go? And if you think about what the outcome would be here if Wachovia were to lose, this money goes right back to W.L. Holmes, the borrower. JLH insurance is a non-debtor, but it's controlled by the trustee. Does it go back to the party? This is a bankruptcy estate, isn't it? It's a bankruptcy estate. Mr. Miller, the trustee, is now the president of JLH insurance. It goes back to the bankruptcy estate. It ultimately goes back to the bankruptcy estate. And I would submit that if JLH insurance had any independence whatsoever from W.L. Holmes, it would have separate counsel in this case, and it would have a claim against W.L. Holmes. Why did you pledge our money? But that claim would be pointless because it would just be W.L. Holmes suing itself. Mr. Woolley, thank you very much for your argument. Thank you very much. Mr. Koren. Thank you. Let me first address Your Honor's question about the California statute and the imputation both ways. I missed it initially, but we did cover that in our brief, and in fact that has been interpreted to not mean that by the California appellate court, which we address in our third-step brief at pages 36 and 37. In 1992, the Court of Appeals in California rejected that interpretation and said that is not what the statute means. It does not mean there is imputation from, for example, an agent acting on behalf of a principal, so therefore it gets imputed up to the principal. No debate over that. But it does not then get imputed back from that principal to other agents and then further imputed to the principles of other principles of that agent, and that's what happened here. We have to remember that there's no evidence that Stelmar had actual knowledge of the pledge. Everything is inferred and imputed. He testified he did not, but the fact that he signed loan letters, which don't mention the pledge and don't mention JLH, they mention the agreement that's being renewed and extended. That's just putting your head in the sand. Not at all. He binds JLH. I mean, he binds W.L. Holmes. No question about it. But now you want to impute to him knowledge he didn't have. JLH is, I'm sorry, it's imputed to W.L. Holmes because he acts on behalf of W.L. Holmes. Well, by signing the loan extension, he's not responsible for anything in the original loan because he didn't read it? No. W.L. Holmes is responsible. Remember, he's acting on behalf of W.L. Holmes, so his conduct is imputed to W.L. Holmes. He has no actual knowledge. What happened here is knowledge he didn't have was imputed both to W.L. Holmes and to JLH when he wasn't acting on behalf of JLH. Clarify that point for me. Mr. Stelmer had no idea that $10 million in JLH's account was being pledged? Correct. That's the testimony. No idea whatsoever. That's absolutely his testimony because he negotiated a renewal of the same unsecured loan. Did he have any idea that Wachovia needed securitization for its $25 million loan? No. All loan relationships prior to that were unsecured. That was an unsecured $25 million? Yes. Prior to this loan agreement, the relationship was unsecured for years at larger numbers. So he testified. Unsecured by any collateral, any money? Unsecured. Just withdraw it and walk away? Unsecured. If you read the record, they refer to it as the unsecured line of credit, and they continue to refer to that before the loan was executed and after the loan was executed. I understand that. I understand your position. But there was no reference anywhere in any of the documents that Mr. Stelmer signed to a $10 million collateral? Correct. None. None. None. He signs only loan letters which refer to another agreement which has the reference. He didn't read the other agreement. Was he not aware that the bank required the transfer of an account of $10 million before the $25 million loan can be approved? No. Testimony is to the contrary. As a matter of fact, what he thought was going on, this money came from another JLH account. There was a JLH account at Bank of America. What Mr. Stelmer thought was going on was that they wanted account relationships, so they wanted all of the business at their bank. So that means close down accounts that you and your subsidiary have at other accounts and give them the business. They make money on deposit accounts. The controller of W.L. Holmes most certainly must have been aware, all right, of the $10 million deposit. The controller. He was the CFO of W.L. Holmes, president of JLH. The controller of W.L. Holmes, aware of what? Of the account? Sure. I just heard Mr. Wooley's argument that the controller of W.L. Holmes was the one who could sign checks out of the $10 million account. Well, there were a number of people who could sign checks. He may have been one of them. There were about six or seven, and many of whom were, no question, officers of W.L. Holmes. If you can withdraw money from the account, if you can dictate who can withdraw, if you are more or less in charge of the account, don't you have use and control of the account? The answer is, as far as I'm concerned, you don't have use and control to pledge the account for some other entity. You're acting on behalf of JLH. You may have use and control if you're acting on JLH's behalf. You don't have use and control just because you have signing authority over an account to pledge it for someone else. If I may just make one final point, and I thank you for your time. We need to step back and we need to think about all of the parent-subsidiary relationships, parent and wholly-owned subsidiaries. Parents always control wholly-owned subsidiaries. They appoint the officers. They appoint the directors. But the law maintains that very important distinction, and that is the same whether you're a captive insurance subsidiary or any other subsidiary, and you have to pay meticulous attention to on whose behalf people are acting. Otherwise, subsidiaries will always be liable for the parent, and parent will always be liable for the subsidiary, and that is not the law. Thank you so much. Great comments. Thank you very much, Mr. Corey.